**Harold Amos BARNARD, Jr.,
Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 68861.**

Court of Criminal Appeals of Texas,
En Banc.

April 8, 1987.

Allen C. Isbell, Houston, for appellant.

Michael J. Guarino, Dist. Atty. and James F. Hury, Jr., Former Dist. Atty. and Jack C. Brock and Miguel Martinez, Asst. Dist. Attys., Galveston, Robert Huttash, State's Atty., Austin, for State.

## OPINION

McCORMICK, Judge.

This is an appeal from a conviction of capital murder. After a jury answered the three special issues affirmatively, punishment was assessed at death.

On the evening of June 6, 1980, sixteen year old Tuan Nguyen was working the cash register in the 7–11 store managed by his family in Galveston. According to eyewitnesses, at approximately 11:00 p.m., appellant and a female companion walked into the store. Appellant asked Nguyen's father, Nguyen Dinh Nguyen, who was also working behind the counter, for a package of Kool cigarettes. Nguyen Dinh Nguyen turned away to get the cigarettes. When he turned around, he saw that appellant had pulled a sawed-off .22 rifle and was pointing it at him. Appellant ordered Nguyen Dinh Nguyen and Tuan Nguyen to put all the money they had into a bag. As the boy was putting money into a sack, appellant's companion told the boy, "Do as he says. He is serious. All of it." As the boy turned around to hand appellant the money sack, appellant raised his gun, aimed it and fatally shot the boy. Witnesses testified that appellant was grinning throughout the whole robbery. After the shooting, appellant pointed his gun at Florentino Gonzales, who had come into the store to buy a soda. Gonzales ducked down and heard appellant's companion tell appellant to "get him." Gonzales testified that he ran to the door, managed to get outside and hid behind a car. He saw appellant and his companion walk out of the store and to a car parked on the side street. Gonzales saw appellant get into the car and watched the car head towards Seawall Boulevard and turn right.

A passerby, Daniel Rouse, testified that as he was driving by the store, he heard what he thought was the sound of a bottle breaking. He looked towards the store and saw two people running out the front door of the store. He also saw an individual wearing a store jacket come out of the store and heard him yelling. Rouse testified that he made a U-turn and parked. He saw two individuals getting into a dark green Monte Carlo with a light colored top, license number VHG 10. He watched the car drive off and turn west on Seawall Boulevard.

Terry Wood, an employee of the Kroger grocery store at the corner of 45th and Seawall in Galveston, testified that she arrived at work at approximately 3:45 p.m. on the day of the offense. She parked her 1973 Ford LTD, license number VHG 10, in the store parking lot. She discovered later that night that her rear license plate had been stolen.

After receiving a description of the car seen leaving the scene of the robbery and murder, law enforcement officers stopped a car matching the description on northbound Interstate 45. Murray Howard, Jr. was driving the car. Beside him was his wife, Regina Faye Howard, and on the passenger side of the front seat was appellant. An individual named James Charles O'Brien was sitting alone in the back seat. Appellant and his companions were taken into custody. A search of appellant revealed a large fold-out buck knife. A search of the Grand Prix revealed a loaded .12 gauge shotgun lying diagonally underneath the dashboard and a sawed off .22 caliber rifle lying underneath the front passenger seat. This rifle had a .22 caliber bullet jammed inside its chamber. In addi-

tion, Alabama license plates were found on the back floorboard of the vehicle. A check of these license plates showed that the car had been stolen in Alabama.

Appellant testified during the guilt-innocence phase of the trial that he had met Murray and Regina Howard and James O'Brien at a club in Houston the night of June 5, 1980. The trio told him that they had just arrived in Houston from Alabama and were short of money. The group spent the evening together drinking. That night Murray Howard showed appellant the sawed-off .22 caliber rifle and told appellant he had used it in the past in several robberies. Appellant met the trio again at the club the next night at approximately 8:30 p.m. According to appellant he had been drinking heavily all day and had smoked one joint of marihuana. After the appellant bought them all a drink, the trio asked him if he would help them commit a robbery. Appellant said that he would and the group left the club. They drove to appellant's house where he dropped off his car and picked up his shotgun. They then drove to Galveston in the Howard's Grand Prix. When they reached Galveston, they stopped at a convenience store where Murray Howard filled the car with gas and appellant bought a bottle of wine and some sunglasses. Appellant proceeded to drink the bottle of wine. They then drove to the Kroger grocery store where they stole a license plate from a car and put it on the Grand Prix. They then drove to the 7–11 store. Murray Howard parked the car around the corner from the store and told appellant and Regina to go in and rob the store. Someone handed appellant the sawed-off .22 caliber rifle and he stuck it into the waistband of his pants. Appellant testified that he and Regina walked into the store. He went and got a can of Coke out of a cooler and then walked to the counter and asked Mr. Nguyen for a package of cigarettes. Appellant then pulled out the gun and told Mr. Nguyen to give him the money out of the register. At that moment Tuan Nguyen turned around and looked at appellant. Appellant told the boy to give him all of money in his register. According to appellant, the boy began

laughing. Appellant testified that suddenly he saw the boy whirling around with his hands raised. Appellant testified that at that point he aimed his gun at the boy's arm and fired. He further testified that he did not intend to kill the boy but only to wound him in the arm.

■ In his first point of error, appellant contends that his indictment is defective. The indictment in pertinent part reads as follows:

"did then and there intentionally and knowingly cause the death of an individual, Tuan Nguyen, by shooting with a rifle; and the said Harold Amos Barnard, Jr. did then and there intentionally cause the death of the said Tuan Nguyen in the course of committing the offense of Robbery, to-wit: the said Harold Amos Barnard, Jr. did then and there while in the course of committing theft and with intent to appropriate and maintain control of property of Nguyen Nguyen, to-wit: money, without the effective consent of the said Nguyen Nguyen and with intent to deprive the said Nguyen Nguyen of said property did then and there intentionally and knowingly cause bodily injury to Tuan Nguyen by shooting him with said rifle,"

Appellant contends the indictment is faulty because the State is "bootstrapping" itself to a capital murder by using the shooting of Tuan Nguyen with a rifle as the aggravating circumstance that converted a theft into a robbery and then using the same shooting of Tuan Nguyen with a rifle coupled with the robbery to elevate the offense to capital murder. He argues that it is impermissible to use the same aggravating factor for the robbery as is used to show the offense of murder. He relies on a felony murder case, *Garrett v. State*, 573 S.W.2d 543 (Tex.Cr.App.1978), for the proposition that when the State decided to allege the elements of robbery, which it was not required to do, it became necessary to allege an act other than the actual homicide as the element which made the underlying crime a robbery rather than a theft.

The motion to quash filed by appellant did not allege this particular deficiency, thus we must restrict our inquiry to determine if fundamental error is present.

■ *Garrett* was a felony murder case in which the Court was concerned with the statutory restriction of the felony murder doctrine which prohibits basing a felony murder prosecution on voluntary manslaughter. In *Garrett,* we held the felony murder rule does not apply where the precedent felony is an assault inherent in the homicide. This limitation on the felony murder rule is called the merger doctrine. The Court noted in *Garrett* that the purpose of the merger doctrine is to prevent the defendant's conviction for murder in the absence of an appropriate culpable state. The Court held that where aggravated assault is the underlying felony in felony murder prosecution the statutory purpose of the merger doctrine would be thwarted.

V.T.C.A., Penal Code, Section 19.03(a)(2) provides that a person commits capital murder if he commits a murder in the course of committing a robbery. V.T.C.A., Penal Code, Section 19.02(a)(1) provides that murder occurs when a person *intentionally or knowingly* causes the death of another individual. Unlike the felony murder provision, V.T.C.A., Penal Code, Section 19.02(a)(3), there is no transferred intent from a lesser offense to a greater offense under our capital murder statute. Rather under the capital murder statute, the commission of robbery is simply one of the circumstances which our legislature deemed to make the murder more deserving of the death penalty.

"The aggravating factors listed in § 19.03(a) were designed only to restrict the jury's discretion to impose capital punishment to 'a small group of narrowly defined and particularly brutal offenses,' so that it would be imposed only for the same types of the most serious crimes, in compliance with the requirements for a constitutional death penalty scheme set out in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). *Jurek v. State,* 522 S.W.2d 934, 939 (Tex.Cr.App.1975), aff'd, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). The Legislature accordingly has found it appropriate to authorize the imposition of the death penalty in cases in which a murder occurs during the commission or attempted commission of a robbery, which might be completed either by assault or by threat. The significant feature of a robbery offense is that the violence or threatened violence occurs during the course of the commission of theft. TEX.PENAL CODE § 29.02 (Vernon 1979). It is this pecuniary motive for robbery-murder that renders it more atrocious.

When this legislative purpose is recognized, the fact that robbery and murder might have a shared element becomes irrelevant." *Randle v. State,* 697 S.W.2d 13 at 16–17 (Tex.App.-Houston (14th) 1985, no petition).

Appellant's first point of error is overruled.

■ In his second point of error, appellant argues that the court's charge on guilt-innocence was fundamentally defective in that it allowed the jury to find him guilty if they found that he murdered the victim in the course of committing theft, rather than in the course of committing robbery. He argues this is reversible error since theft is not one of the aggravating offenses listed in the capital murder statute.

The application paragraph of the court's charge reads as follows:

"Now if you find from the evidence beyond a reasonable doubt that on or about the 6th day of June, 1980, in Galveston County, Texas the defendant, Harold Amos Barnard, Jr., did intentionally kill Tuan Nguyen by shooting him with a rifle and that said defendant did then and there intentionally cause the death of the said Tuan Nguyen *in the course of committing theft and with intent to appropriate and maintain control of property* of Nguyen Nguyen, to-wit: money, without the effective consent of the said Nguyen Nguyen *and* with intent to deprive the said Nguyen Nguyen of said property *did then and there intention-*

*ally and knowingly cause bodily injury to Tuan Nguyen, to-wit: death, by shooting him a rifle,* then you will find the defendant guilty of capital murder." (emphasis added)

Appellant is ignoring the bulk of the paragraph. Immediately after the language "in the course of committing theft" the court charged in the conjunctive the remaining elements of the offense of robbery. V.T.C.A., Penal Code, Section 29.02. Reading the paragraph as a whole, it is clear that the charge required the jury to find appellant guilty only if it found appellant intentionally killed the victim while in the course of committing robbery. There is no error. This point of error is overruled.

■ The record shows that Calvin Sliger was the first venireman individually voir dired. At the conclusion of Sliger's examination, the State excused him for cause based on *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). The defense objected but the court sustained the challenge. After the State had finished its direct examination of the next prospective juror, Hillard B. Rodgers, but before the defense began its questioning of Rodgers, the court called a short recess. During the recess, the State informed the court that it was withdrawing its challenge for cause on Sliger and was exercising its first peremptory challenge on him. Appellant voiced no objection to this procedure. Appellant now argues that the initial exclusion of Sliger was error and such error was not cured by the State's belated decision to use a peremptory strike on him.

A review of Sliger's voir dire testimony shows him to be the classical equivocating juror. When questioned by the State, he expressed strong conscientious principles against the death penalty and testified emphatically that he could not be a fair and impartial juror. Then when questioned by the defense, he repeatedly stated that he could set his views aside and judge the case solely on the evidence presented and the law given to him by the court. Sliger's equivocation continued throughout the course of a lengthy voir dire examination.

After the State had interposed its challenge for cause, Sliger, in response to questioning by the court, testified that he would not automatically vote against the death penalty. The State took one last turn questioning Sliger and the following occurred:

"Q. Okay. Mr. Sliger, just a quick question or two, I promise. You told us it would affect—the death penalty would affect your deliberations. What we need to know is how much would it affect you. Would it affect you substantially, or just a little bit, or how would it affect your deliberations?

"A. Well, I'm sure it would affect it substantially in the fact, just like I told you before, if the evidence, if there could be two sides to the story, it would sway me to the side that would do away with the death penalty; plus the fact that, just like I told you, in all clear conscience I wouldn't want it on my conscience that I put anybody to death or had anything to do with it. But saying I wouldn't want to doesn't mean I wouldn't.

"Q. So, would you say that you could do it with the degree of impartiality that it would not substantially affect your deliberations?

"A. No, sir, I sure couldn't."

In *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court recently clarified the standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment.

"That standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' We note that, in addition to dispensing with *Witherspoon's* reference to 'automatic' decision making, this standard likewise does not require that a juror's bias be proved with 'unmistakable clarity.' This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen

simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. For reasons that will be developed more fully *infra,* this is why deference must be paid to the trial judge who sees and hears the juror." 105 S.Ct. at 852. (footnotes omitted)

Using this standard we have evaluated Sliger's testimony. Clearly Sliger's bias was not made "unmistakably clear." However, we find that his testimony does contain enough to support the trial judge's decision that Sliger's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. Therefore we defer to the decision of the trial judge and hold that the State's challenge for cause was properly sustained.

 Furthermore, even if the court had erroneously granted the State's challenge, we find that the error was cured when the State exercised a peremptory challenge. Appellant contends that based upon our decision in *Grijalva v. State,* 614 S.W.2d 420 (Tex.Cr.App.1980), the State should not have been allowed to exercise retroactively its peremptory strike. We find *Grijalva* to be inapposite to the case at bar. Rather we find *Franklin v. State,* 693 S.W.2d 420 (Tex.Cr.App.1985) to be on point. In *Franklin,* the court sustained the State's challenge for cause to prospective juror Garcia. The court then took a ten minute recess. When the proceedings were reconvened, the State requested that it be permitted to withdraw the challenge and exercise a peremptory strike. The court granted the State's request. On appeal Franklin also relied on *Grijalva.* This Court wrote the following:

"In *Grijalva,* the State sought to exercise a peremptory strike after an erroneous exclusion for cause was found on appeal. We departed from a line of cases permitting late exercise of peremptory strikes and held that such a practice gave the State unfair advantages in the jury selection process for capital cases. Our decision was based upon three benefits given to the State. First, the practice permitted the State and not the defendant to exercise its judgments with a perspective of the entire jury panel. Second, the State could avoid wasting a peremptory strike on a veniremember struck by the defendant. Third, allowing the State to exercise a peremptory challenge on appeal permitted it to transform a peremptory strike against a prospective juror into a peremptory strike against a ground of error. [citations omitted]

"Initially, in the instant case the State was not permitted to exercise its peremptory strike retroactively. In *Grijalva,* supra, the State sought to exercise its peremptory strike on appeal. In *Vigneault v. State,* 600 S.W.2d 318 (Tex.Cr. App.1980), cited in *Grijalva,* supra at 424, the State was allowed to wait until the conclusion of the jury selection before exercising four unused peremptory strikes.

"At the trial below, since no other prospective jurors were examined or struck between the granting of the challenge for cause and the request to substitute a peremptory challenge, the challenge was not retroactively made. Rather, the State was permitted to correct an error made in the challenge to Ms. Garcia ten minutes earlier.

"Also, the benefits considered in *Grijalva,* supra, did not inure to the State when the substitution request was granted. We do not read *Grijalva* to hold that once the State voices its challenge, the challenge becomes set in stone and cannot be changed. Thus, the trial court did not err in permitting the State to exercise its peremptory challenge...." 693 S.W.2d at 427

As in *Franklin,* we do not construe the State's peremptory challenge to be truly

retroactively made. As noted above, the peremptory challenge was used during the voir dire examination of the second prospective juror before the defense had even begun to examine that individual. No other jurors were fully examined or struck between the granting of the challenge for cause and the request to substitute a peremptory challenge. As in *Franklin,* the trial court was merely allowing the State to correct any error made in the challenge to Sliger. None of the benefits accruing to the State in *Grijalva* occurred to the State in the instant case as a result of being allowed to change the challenge for cause to a peremptory challenge. We find the State was not belatedly exercising its peremptory challenge after having examined the entire voir dire panel as was condemned in *Grijalva.* Finally, we find that since appellant failed to object at the time the State exercised its peremptory challenge against Sliger, error, if any, was waived. Appellant's third point of error is overruled.

In his fourth point of error, appellant argues that the court erred in sustaining the State's challenge for cause to venireman Timothy L. Allen on the ground that he could not return a verdict of guilt based on circumstantial evidence.

In response to the State's initial questioning regarding circumstantial evidence, Allen testified that the only way he could convict an individual of capital murder was if he himself actually saw the offense committed. He expressed a fear that an innocent person could be found guilty of capital murder if he relied on the testimony of another person. Defense counsel then tried to rehabilitate Allen by posing two excellent hypothetical questions:

"Q. Okay. Mr. Allen, let's talk a little bit about what the prosecutor calls circumstantial evidence and direct evidence. Circumstantial evidence is not mysterious, just common sense. A good example, you go to sleep at night, and before you go to sleep you look out and stretch and yawn, and you look at the grass, and the moon is shining, and the grass is dry. You go to sleep. You sleep like a rock, and you wake up in the morning and the grass is wet. You didn't see it rain, but you get up and there are puddles outside, and the grass is wet. The garden is flooded. You look down the street, and the street is wet, and houses are wet. You say to yourself, 'It rained last night.'

You didn't see it rain. That's circumstantial evidence. All right?

Do you ever feel with strong circumstantial evidence like that, you could sit on the jury panel in a capital murder case with strong circumstantial evidence, and render a verdict according the the evidence?

"A. That question you asked me, or statement you made, is a little different. See, that's reality. I knew it would rain. I wouldn't have to see it rain to know it would rain.

"Q. There are some circumstantial cases that are that strong as to make them reality, as to prove them beyond a reasonable doubt. There are many, many, examples of that, and what we are asking is if it is shown to you beyond a reasonable doubt by circumstantial evidence, and it is shown to you in such a manner that it excludes every other reasonable explanation except the guilt of the Defendant, could you use that circumstantial evidence to find a person guilty in a capital murder case? That's all we are asking, could you follow that instruction, if it was proved to you by a moral—beyond a moral certainty, beyond a reasonable doubt, and every other explanation was excluded except the Defendant's guilt? Could you use that circumstantial evidence?

"A. Yes and no.

"Q. All right.

"THE COURT: You said yes and no?

"MR. ALLEN: Yes and no.

"Q. (By Mr. Drosnes) All right, sir.

"A. I answered the question that way because we are going right back.

"Q. It's a ping pong match. We understand it. We don't mean it to be that

way, but you see what I am saying, there is some circumstantial evidence is so strong, there is no doubt. That's all it boils down to. They have proved it beyond a reasonable doubt by circumstantial evidence, and there is that strong circumstantial evidence. There is no other explanation but the guilt of the Defendant.

Would you be able to find a person guilty based on that evidence?

"A. Boy, you all are putting me on the spot. I don't know how to answer that question.

"Q. Let me give you an example then, and maybe it will help you a little bit. You worked in a bank—well, not you, you're on a jury, and a man comes to the witness stand and he is sworn in. He says he is an employee in the bank. He says that he had access to the vault in the bank, which was a small vault, and he knew every bit and part of the vault. He says that he went in one day in the vault, and nobody else was in there. He was sure it was a small vault, and he went to every area, and nobody was in there. Then he went out.

He then said that when he went out two other employees, Mr. Guarino and Mr. Brown, went in. He knew both of these employees very well, and knew their voices. He heard Mr. Guarino say to Mr. Brown in a loud voice, and knew Mr. Guarino's voice, he heard Mr. Guarino say, 'Give me your money, or I'm going to kill you with this gun.' Then he heard Mr. Brown say, 'I'm not giving you my money.'

Then he heard a shot, and saw Mr. Guarino run out with a gun, and Mr. Brown's wallet.

He is testifying on the stand. Now, the man that's testifying, Mr. Allen, did not see that incident. That is not direct evidence. That is circumstantial evidence. But that is pretty strong circumstantial evidence. That's one type of pretty strong circumstantial evidence.

Could you use evidence like that and render a decision in a capital murder case based on that kind of evidence?

"A. By listening to someone else, like if you came to me and told me you saw.

"Q. You remember the man outside, the bank employee, didn't see Mr. Guarino actually shoot him. All he is testifying to is what he did see. But what he saw was the two men go in, the one man whose voice he recognized demanding money from the other man, or he would shoot him with a gun, testified that there was no entrances to the vault except through the front door where he went in. The man also testified he heard a shot, and saw Mr. Guarino run out with the gun still smoking, and the wallet of Mr. Brown in his hand. That's circumstantial evidence. That evidence proves the guilt of the Defendant and excludes every other reasonable hypothesis except the person's guilt.

If that—not that, but evidence is strong was presented to you that was circumstantial evidence, could you enter into a finding with the other members of the jury of guilt in a capital murder case?

"A. Yes, sir."

The State then questioned Allen again:

"Q. All right. Mr. Allen, now are you saying that you could listen to other witnesses, and not have to see it first to base a conviction in a capital murder case?

"A. Okay. All right. Now, I understand. I'm sorry. And not see it myself?

"Q. Right.

"A. Well, could I just—I'm going to just say what I feel. If it was somebody that I knew, and I knew that this person wasn't lying, maybe I could. But somebody that I didn't know nothing about, no, I couldn't.

"Q. You could not base—

"A. Use that as evidence, no.

"Q. You would have to either know the person testifying personally, or have seen it yourself?

"A. Right.

"Q. Before you could ever believe to the extent to base a conviction on in capital murder cases? Is that correct?

"A. Right.

"Q. That applies to circumstantial evidence also.

"A. Circumstantial evidence?

"Q. Right. No eyewitnesses? Earlier you said you could not base a conviction on circumstantial evidence, no eyewitnesses.

"Q. Do you mean if I seen it myself?

"Q. No, nobody, saw it. People came up you didn't know, and testified to circumstances around the offense. Not that they saw the offense, but circumstances around the offense. Nobody saw a capital murder.

"A. I wouldn't believe that.

"Q. And you never would?

"A. No.

"Q. Under any set of circumstances you could never base a conviction—

"A. No.

"Q. —in a capital murder case on circumstantial evidence? Is that correct? Is that correct?

"A. That's correct."

The State then challenged Allen for cause under Article 35.16(b)(3), V.A.C.C.P. Over appellant's objection the court granted the State's challenge.

■ Article 35.16(b)(3), supra, authorizes the State to challenge for cause any venireman who has a bias or prejudice against "any phase of the law upon which the State is entitled to rely for conviction or punishment." In reviewing a point of error such as this one, we must accord due deference to the trial court's determination given its position to gauge the juror's sincerity and demeanor. *McCoy v. State*, 713 S.W.2d 940 (Tex.Cr.App.1986); *Wilkerson v. State*, 726 S.W.2d 542 (Tex.Cr.App.1986).

■ Although appellant is correct that Allen told defense counsel he could render a verdict of guilt based on circumstantial evidence, it is clear that later during the voir dire examination when Allen was specifically asked if he could use circumstantial evidence to find a verdict of guilty in a capital murder case, Allen replied unequivocally that he could not. We find that the trial court did not err by granting the State's challenge for cause to this prospective juror.

■ In his fifth point of error, appellant contends that the trial court erred in not allowing him the opportunity to question venireman William A. Barnes. During the State's general voir dire of the entire jury panel, venireman William Barnes testified that he had read about the offense in the newspaper and in addition had known the victim. The prosecution then asked Barnes if as a result of having heard something about the case, he had reached a conclusion as to the guilt or innocence of the appellant. Barnes replied that he believed he had. The prosecutor continued his questioning:

"MR. BROCK: Mr. Barnes, you have indicated you have reached a conclusion as to guilt or innocence of this Defendant at this time.

Can you tell me, is that conclusion such that it would affect your ability to reach a verdict in this case?

"MR. BARNES: Well, not to reach a verdict, but I would be prejudiced.

"MR. BROCK: It would prejudice you in reaching a verdict in this case?

"MR. BARNES: Yes."

The State then challenged Barnes for cause under Article 35.16(a)(9), V.A.C.C.P. Appellant, acknowledging that under Article 35.16(a)(9), supra, he was not entitled to voir dire Barnes, requested that he be allowed to do so anyway. The court denied the request and sustained the State's challenge for cause. Appellant now argues that Barnes was equivocating on his answers and therefore he should have been allowed to question Barnes.

At the time of appellant's trial in March of 1981, Article 35.16(a)(10) provided as follows:

"That from hearsay, or otherwise, there is established in the mind of the juror such a conclusion as to the guilt or innocence of the defendant as would influence him in his action in finding a verdict. *To ascertain whether this cause of challenge exists, the juror shall first be asked whether, in his opinion, the conclusion so established will influence his verdict. If he answers in the affirmative, he shall be discharged without further interrogation by either party or the court.* If he answers in the negative, he shall be further examined as to how his conclusion was formed, and the extent to which it will affect his action; and, if it appears to have been formed from reading newspaper accounts, communications, statements or reports or mere rumor or hearsay, and if the juror states that he feels able, notwithstanding such opinion, to render an impartial verdict upon the law and the evidence, the court, if satisfied that he is impartial and will render such verdict, may, in its discretion, admit him as competent to serve in such case. If the court, in its discretion, is not satisfied that he is impartial, the juror shall be discharged;" (emphasis added)

We must overrule appellant's point of error. A reading of Barnes' answers show that there was no equivocation. Clearly his conclusion as to the guilt or innocence of appellant was going to "influence" or, in Barnes' own words, prejudice his decision as to a verdict. The court correctly terminated all further questioning and excused the venireman. This ground is clearly without merit and we hereby overrule it.

 In his sixth point of error, appellant argues that the trial court erred in having general voir dire of the entire jury panel by both the State and the defense in addition to individual voir dire. He asserts that a general voir dire of the entire jury panel is not authorized by Article 35.17, V.A.C.C.P., and thus the case must be reversed.

The record shows that prior to trial the court informed the participants that in order to save time, prior to the individual voir dire of the venireman, he would give each side an opportunity to voir dire the entire panel regarding general principles of the law and acquaint them with the case. Appellant strenuously objected to this procedure. He reurged this objection immediately prior to the start of the State's general voir dire of the panel. During the State's general voir dire examination, prospective juror Barnes (who was the subject of the fifth point of error) and prospective juror Clifton Moore were excused because both men testified that they had reached a conclusion regarding the appellant's guilt or innocence and their conclusions as to the guilt or innocence of appellant would influence their verdicts. Following the State's general voir dire examination, defense counsel also conducted a general voir dire examination.

Article 35.17, V.A.C.C.P., provides for the procedure to be used during voir dire examination:

"1. When the court in its discretion so directs, except as provided in Section 2, the state and the defendant shall conduct the voir dire examination of prospective jurors in the presence of the entire panel.

"2. In a capital felony case, the court shall propound to the entire panel of prospective jurors questions concerning the principles, as applicable to the case on trial, of reasonable doubt, burden of proof, return of indictment by grand jury, presumption of innocence, and opinion. Then, on demand of the State or defendant, either is entitled to examine each juror on voir dire individually and apart from the entire panel, and may further question the juror on the principles propounded by the court."

Thus, it is clear that the court has discretion to control the manner of voir dire with the exception that in capital murder cases both the State and the defense must be accorded the right to examine each prospective juror individually. In the instant case that directive was followed and the statute was not violated.

The court's action in allowing each side the opportunity to have a general examination of the entire panel before individual

voir dire began was an effort to shorten the lengthy voir dire process. We can find no reason to declare such a practice an abuse of the court's discretion. Appellant contends that the fact that Barnes and Moore were excused in front of the entire jury panel prejudiced the entire panel. Appellant offers no evidence of prejudice and we have found none. We find no support for this contention. Appellant's sixth point of error is overruled.

In his seventh point of error, appellant argues that reversible error occurred when the State injected prejudicial and inflammatory matters which were not relevant to the issues of the trial. During the appellant's direct testimony at the guilt-innocence phase of the trial, appellant testified that when Murray Howard first showed him the sawed-off .22 rifle later used to kill the victim, he had told Howard it looked like a cannon. Appellant also testified that he had had a .22 rifle when he was a kid and used it to shoot rabbits and squirrels. Later when describing the offense, appellant testified that when he shot the victim he had no intent to kill him but merely to shoot him in the arm.

▓▓▓ During cross-examination by the State, appellant was describing the events of the offense when the following occurred:

"Q. Now, you are standing there with this .22 rifle, which earlier you told Murray Howard it looks like a cannon to you.

What did you mean by that?

"A. That is (sic) was a large gun, big gun, for a handgun.

"Q. Could you see the barrel?

"A. Yes, sir, after I was allowed to examine it.

"Q. So you knew very well what sort of a gun it was at the time you were standing there?

"A. Yes, sir.

"Q. *You were familiar with .22's, and what .22's could do?*

"A. *Yes, sir.*" (Emphasis added)

The prosecutor then asked appellant if he remembered the date of March 13, 1978. Appellant replied that it was around that time that he had divorced his second wife and married his third wife. The prosecutor then asked:

"Q. In addition to it being the date you divorced Guandel Barnard, the date that Guandel's 14 year old son was accidently killed by a rifle not greatly unlike that is that not true?"

Appellant immediately objected on the basis that the shooting of the child was irrelevant. His objection was overruled. Appellant now argues that this matter was not pertinent to any issue and was placed before the jury for the sole purpose of inflaming them. He asserts, moreover, that the error was compounded when the prosecutor referred to the accidental killing during his jury argument on guilt-innocence.

"... if a person intentionally takes a gun, intentionally walks into a store, intentionally places people in fear, intentionally points it at someone, and intentionally pulls the trigger, don't you know the intention to kill is there? He knows what a .22 is. He knows what a rifle can do.

"You have heard testimony how the stepson, after the divorce, was shot and killed with a .22 rifle. Don't you think that there ought to be some countability (sic) other than the mere fact that the person standing before you is saying, 'Well, Ladies and Gentlemen, I didn't really intend to kill him.' "

This Court has repeatedly held that a general objection such as the type used here presents no error for review. *Goodrich v. State*, 632 S.W.2d 349 (Tex.Cr.App. 1982); *McWherter v. State*, 607 S.W.2d 531 (Tex.Cr.App.1980); *Smith v. State*, 513 S.W.2d 823 (Tex.Cr.App.1974); *Simpson v. State*, 507 S.W.2d 530 (Tex.Cr.App.1974).

▓▓▓ Nevertheless, we will examine the merits of appellant's complaint. The State asserts that the matter was relevant to impeach appellant's implied opinion that a .22 rifle was a small game and rabbit gun. We think the State is misconstruing appellant's prior testimony. Nowhere did appellant testify that he thought a .22 was used only for shooting small game. Appellant admitted during the State's cross-ex-

amination before the State injected the prejudicial matter that he knew what a .22 was capable of doing. We are compelled to find that the prosecutor was acting with the purpose of inflaming and prejudicing the jury by injecting this evidence and implying that in some way appellant was responsible for the death of his stepson. This was error.

We find, however, that the error was cured when during redirect examination, in an effort to meet and explain the earlier testimony, appellant related that his stepson had been at a friend's house and the two boys were playing with a loaded .22 when the rifle accidentally went off and hit the boy in the head. This testimony showed that appellant was in no way connected to the boy's death and the error caused by the State's insinuations was corrected. *Paulus v. State*, 633 S.W.2d 827 (Tex.Cr.App.1982) (Opinion on Rehearing). This point of error is overruled.

In his eighth point of error, appellant argues that the trial court erred in excluding evidence offered to show appellant's irrational state of mind on the day of the offense. At trial, Marie Farquhar, a friend of appellant, testified that appellant came to her house at approximately 10:00 a.m. on the day of the offense. She testified that appellant was drunk and appeared to be very upset. The following then occurred:

"Q. Did you learn the reason why he was upset?

"A. Yes, I did.

"Q. And what did you learn?

"MR. BROCK: Your Honor, that calls for a hearsay conclusion on the part of this witness.

"THE COURT: Objection sustained.

. . . . .

"Q. ... You can't testify as to what Mr. Barnard told you, but you did testify he looked upset to you?

"A. Yes, sir.

"Q. Could you describe his actions, not what he said, but just his actions?

"A. Well, he was completely irrational in his behavior. I was—

"MR. BROCK: Objection, Your Honor. That is a conclusion on the part of the witness for which she has laid no predicate and no basis.

"THE COURT: Objection sustained.

"MR. BROCK: I would ask the Jury be instructed to disregard that.

"THE COURT: Ladies and gentlemen of the Jury, you are instructed to disregard any statement the witness made about the Defendant being irrational."

Defense counsel then resumed his questioning by asking what appellant and the witness did when he came to her house that morning. No attempt was made to lay the predicate so that Farquhar could testify about appellant's irrationality.

At the conclusion of appellant's direct examination of Farquhar, the jury was excused and appellant perfected a bill of exceptions during which Farquhar testified that appellant had just learned that his third ex-wife did not want to reconcile with him and as a result he was very emotionally disturbed. She testified that appellant had told her on the morning of the offense that he did not want to live any more if he could not have his wife.

Appellant asserts that such testimony was admissible under V.T.C.A., Penal Code, Section 19.06 which provides that in a prosecution for murder or voluntary manslaughter, the defendant should be allowed to present testimony as to all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense. Due to the posture of the record before us, it is unnecessary for us to address the merits of appellant's contention. It is apparent from the excerpt of the record set out above that the trial court never ruled such testimony to be inadmissible. The State's objection and the court's ruling regarding Farquhar's testimony only pertained to the failure of the defense to lay the proper predicate to Farquhar's conclusion that appellant was acting irrational. No attempt was thereafter made to lay that predicate before the jury. After the testimony was given outside the presence of the jury, ap-

pellant never requested the court to rule on the admissibility of the testimony. Appellant may not complain on appeal of the exclusion of testimony in the absence of an offer of the testimony and a ruling by the trial court excluding it from evidence. *Adams v. Texas*, 577 S.W.2d 717 (Tex.Cr. App.1979), reversed on other grounds 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). This point of error is overruled.

■ In his ninth point of error, appellant complains of the following jury argument made by the prosecutor during the guilt-innocence phase of the trial.

"I think you should come to the realization, or I would present to you on the evidence that you should come to the realization, Ladies and Gentlemen, there is some people that are just mean people. They are just mean. They are mean for mean's sake. They could care less about your rights, my rights, or anybody's rights. They don't care if a man is 20 years old, 16 years old, 8 years old, or 80, or anything. There are people like that, and it is not comfortable to admit, and I think Harold Barnard is one of those type of persons."

Appellant objected to the insertion of the prosecutor's personal opinion and the court overruled the objection.

Appellant asserts that this "blatant statement of personal opinion" about appellant constitutes reversible error. We disagree. It is well settled that the prosecutor may argue his opinions concerning issues in the case so long as the opinions are based on the evidence in the record. *McKay v. State*, 707 S.W.2d 23 (Tex.Cr. App.1985). Clearly, the statement of the prosecutor was an acceptable argument in that his belief was predicated upon the evidence adduced during trial. He was not merely expressing his unqualified personal opinion about appellant but was summing up the fact that the evidence, as he viewed it, established that appellant was a "mean person." *Davis v. State*, 642 S.W.2d 510 (Tex.Cr.App.1982). We find this to be a reasonable deduction from the evidence. *Alejandro v. State*, 493 S.W.2d 230 (Tex.

Cr.App.1973). Appellant's ninth point of error is overruled.

■ In his tenth point of error, appellant argues that the evidence is insufficient to support the jury's affirmative answer to the second special issue. The second special issue is found in Article 37.071(b)(2), V.A.C.C.P., and requires the jury to determine:

"whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; . . ."

At the punishment stage of the trial, the State introduced evidence showing that appellant had been convicted of the offense of burglary in Dallas County in 1963, the offense of burglary in Franklin County in 1963, the offense of breaking and entering a coin operated machine in Dallas County in 1965, and the offense of an ex-convict carrying a pistol in Dallas County in 1965.

The State also introduced testimony from five witnesses that appellant's reputation for being a peaceful and law-abiding citizen was bad. Two of these witnesses also testified concerning encounters they had had with appellant. Sgt. Carl Raley of the Dallas Police Department testified that on December 5, 1960, at approximately 2:00 a.m., he arrested appellant for auto theft but the charge was later reduced to joy riding. Deputy E.D. Lucas of the Harris County Sheriff's department testified that he arrested appellant on an assault warrant on September 9, 1979.

In addition to reputation testimony the State produced an abundance of evidence regarding numerous instances of appellant's run-ins with the law. Linda Roberts, a 33 year old lab technician from Dallas testified that on May 11, 1961, when she was thirteen years old she and a girlfriend were walking down a street when appellant and two other boys pulled up in a car. Appellant was sitting in the back seat of the car holding a handgun. Roberts testified that she and her friend were forced into the car. Roberts sat in the back with appellant. They drove to an apartment complex where they all exited the car and entered an apartment. Roberts testified

that appellant took her into a bedroom and fired a shot from the gun at the wall. Appellant then raped her. After Roberts' testimony the State introduced evidence showing that as a result of the incident with Roberts, appellant was convicted on September 12, 1961 of the offense of assault with intent to commit rape. Appellant was sentenced to a five year prison term and the sentence was then suspended.

Assistant Police Chief Bob Wade of the Garland Police Department testified that in January of 1963, while appellant was being held on a charge of burglarizing a service station, he escaped from the Garland City Jail by climbing out an air-conditioning vent and ventilation shaft.

Retired Houston police officer Forrest Perry testified that on January 11, 1963, while working as a patrol officer, he was dispatched to an address where two burglary suspects from Dallas, one of whom was appellant, were supposed to be hiding. Perry testified that appellant was at the address but gave him a false name and showed him a false driver's license and social security card. When Perry pointed out that appellant did not match the age and description listed on the driver's license, appellant gave him another fictitious name. Perry testified that he took appellant and his companion to the Houston Police Department where he turned them over to the burglary division. Appellant was later released.

Titus County Sheriff John Moss testified that on February 2, 1963, when he was employed with the Mount Pleasant Police Department, he stopped a car in which the seventeen year old appellant was a passenger. Appellant was riding in the front right seat. Moss testified that he noticed that there were two tires in the back seat leaning against the front seat. A red rag was lying on top of one of the tires. After noting that the car had been hotwired, Moss also noticed that appellant was reaching into the back seat as if to get his hand under the rag. Moss testified he immediately ordered appellant and his companions to get out of the car. After they had exited the car, Moss reached in under the

rag and found a loaded .22 caliber pistol. A further search of the car revealed a loaded .38 caliber snubnose pistol. An investigation revealed that the tires in the back seat and other items in the back seat of the car had been stolen in a gas station burglary. The vehicle had been stolen in Dallas earlier in the evening.

Lieutenant Terry Hauck of the Dallas Police Department testified that on August 14, 1965, he was working as a patrol officer. Shortly after midnight, he was dispatched to a Dallas bar to investigate a disturbance with a gun. After receiving information from an individual on the scene, Hauck and his partner stopped a red Chevrolet pickup being driven by the appellant. After getting out of the police car, Hauck ordered appellant to exit his truck. Appellant instead stuck his arm out of the driver's window and fired a shot. Hauck fired a shot in return and appellant drove away. Hauck and his partner pursued appellant for several blocks until appellant abandoned the truck and fled on foot. Hauck captured appellant as he was trying to climb over a fence. Appellant's weapon, a .22 caliber Rhome pistol, was found four or five steps away from the fence. The pistol contained five spent rounds and one live round.

Tammy Gatlin testified that she was the daughter of appellant's second wife, Guandel Marie Wiley. Gatlin testified that on one occasion in 1971, when she was about 11 years old, her mother had left her at home to babysit her younger brother while she attended a PTA meeting. On that evening appellant asked her to come into his bedroom and rub suntan lotion on him. When she got in the bedroom, appellant turned out the light, took off Gatlin's pajama pants, removed his pants and tried to have sexual intercourse with her. He was unable to penetrate her. After the incident he told her not to tell anyone. Between 1971 and 1975, appellant made several unsuccessful sexual advances towards her. Gatlin further testified that on May 15, 1975, appellant and her mother had separated. At around 4 a.m. while everyone was in bed, appellant came to their house and woke up Gatlin, her mother and her

three brothers. Gatlin and her mother went into the living room to talk to appellant, who seemed to be intoxicated. Appellant offered Gatlin money "for a piece of ass." When Gatlin refused, appellant broke a coke bottle and began threatening Gatlin and her mother with the jagged edge of the bottle. Gatlin and her mother ran into a bedroom and appellant followed them, unzipping his pants and pulled out his penis. Appellant again asked Gatlin to engage in sexual intercourse and she refused. Eventually the police were called and appellant was arrested. Finally, Gatlin testified that in her opinion appellant was a very violent person.

Officer R.J. Matthias of the Houston Police Department testified that while on patrol on July 14, 1977, at approximately 10:45 p.m., he arrested appellant for DWI. Matthias testified that while he was talking with appellant at the police substation, appellant became angry and swung at him. Appellant was restrained by another officer.

The State also introduced the testimony of Leona Deily. Deily testified that in February of 1979, appellant lived across the sidewalk from her. Deily testified that on February 3, 1979, she saw appellant, who was intoxicated, walk down the sidewalk and kick at her gate which was open and blocking the sidewalk. The force of appellant's kick broke her gate. Deily and a friend went outside and the friend asked appellant to pay for the damage. Appellant told Deily's friend that if he did not shut up, he would be harmed. Appellant then pulled out a small, silver handgun and told Deily and her friend that if they did not get out of the way, he would use it. Deily and her friend went inside Deily's apartment. Later Deily and her friend left the apartment for a couple of hours. Deily's thirteen year old daughter and a girlfriend stayed at the apartment. When Deily returned she noticed her father's car and a police car parked in front of her apartment. Deputy L.H. Heinrich of the Harris County Sheriff's department testified that he responded to a call at Leona Deily's apartment on February 3, 1979 regarding someone shooting a gun. Deily's daughter reported that appellant had been firing a gun. Heinrich arrested appellant for public intoxication. A search of appellant revealed a .32 caliber revolver.

Houston police officers James Park and David Cook testified that they were moonlighting as security guards at the Vagabond Club on the evening of March 9, 1980, when a customer reported that a person was in the parking lot waving a gun. The two officers went to the parking lot where they saw appellant standing near the driver's side of a vehicle. This vehicle and another vehicle had been involved in an accident. The driver's door was open. As Park neared the vehicle, he saw a pistol lying on the front seat of the car. Appellant attempted to climb in the car and reach for the gun. The officers told appellant to stop and get out of the car. Cook removed the pistol, a Ruger .357, from the car. The gun was loaded with six live rounds of .357 magnum hollow point ammunition. Cook testified that he also found an envelope in the car bearing appellant's name. Appellant was arrested for carrying a weapon, a Ruger .357 pistol.

Testimony was also presented which showed that while awaiting trial in the instant case, appellant attempted to escape from the Galveston County jail, first, by attempting to saw through the bars of his jail tank and then, by cutting off the rivets attaching a light fixture to the cell wall in hopes of gaining entrance to a catwalk used by maintenance personnel to fix plumbing. The evidence showed that appellant had been given a putty knife and saw blade by jail trustees. These items were discovered in a shakedown conducted by jail personnel on December 10, 1980.

Appellant's evidence at the punishment phase included the testimony of three men for whom appellant had worked. All three employers testified that appellant was dependable and hard working and exhibited no signs of violence. Appellant's final witness was his mother, who testified that her son was a good man who had helped her financially, but who had a drinking problem and needed psychiatric help.

We find that the State clearly proved beyond a reasonable doubt that appellant would constitute a continuing threat to society. The evidence showed four prior felony convictions resulting in prison terms, one conviction for the offense of assault with the intent to commit rape for which appellant received a suspended sentence, repeated possession of firearms and numerous other run-ins with law enforcement officials. *Thompson v. State*, 691 S.W.2d 627 (Tex.Cr.App.1984). This point of error is overruled.

■ In his eleventh point of error, appellant argues that the trial court erred in allowing Steven R. Stephens, a Dallas police officer to testify regarding appellant's reputation as a peaceful and law-abiding person because the officer had never discussed appellant's reputation with anyone. Detective Stephens testified that he came into contact with appellant in March of 1965:

"Q. Let me ask you, Detective Stephens, as part of your becoming familiar with the Defendant, did you have an opportunity to discuss with the people in the community in which he resided his reputation as a peaceful and lawabiding (sic) citizen in the community during that time?

"A. No, I really didn't.

"Q. Did you have occasion to talk with any people concerning the Defendant during that period of time?

"A. Other than himself?

"Q. Yes.

"A. No, not really.

"Q. What were the circumstances under which you became familiar with him?

"A. He was assigned to me as a prisoner when I was a detective in the burglary and theft division on a case in which I was working.

"Q. Okay. As part of that investigation, did you have an opportunity to talk with any other persons concerning that investigation?

"A. Yes, I did.

"Q. And were these police officers?

"A. Yes, I talked to the police officers, and there were some other people involved, yes.

"Q. And in talking with the people involved in that offense, as well as what other information you may have had on the Defendant, do you feel that you came to know the reputation which he enjoyed in the community in which he resided as being a peaceable and law-abiding (sic) citizen?

"MR. DROSNES: Objection. The officer already testified that he didn't know the Defendant's reputation. It is a reputation question.

"THE COURT: Objection overruled.

"Q. (By Mr. Brock) During that investigation, do you feel you had an opportunity to come to know his reputation in that area in the city of Dallas at that time?

"A. Yes, I came to know it, yes.

"Q. Would you say that reputation, as to being peaceful and lawabiding (sic), was good or bad?

"A. It was bad."

Appellant argues that talking to police officers and "other people involved" in a case does not qualify Stephens as a reputation witness since he expressly disclaimed talking with any people concerning appellant's reputation as a peaceful and law-abiding citizen.

Reading Stephens' testimony as a whole we are compelled to find that he was qualified as a reputation witness. Although he initially testified that he had not discussed appellant's reputation with anyone in the community, he later testified that in talking to other officers and other people involved in the offense he was investigating in 1965 he came to learn appellant's reputation for being a peaceful and law-abiding citizen in the community in which he resided. *Hoffert v. State*, 623 S.W.2d 141 (Tex.Cr.App. 1981); *Henry v. State*, 567 S.W.2d 7 (Tex. Cr.App.1978).

■ Furthermore, we find that if Stephens' testimony was erroneously admitted, it was harmless. As noted above, during the punishment phase of the trial evidence was presented as to appellant's

lengthy criminal record which included five prior felony convictions. Several other reputation witnesses were presented who all testified that appellant's reputation for being a peaceful and law-abiding citizen in the community in which he resided was bad. Finally, numerous witnesses testified as to various altercations they had had with appellant. On this state of the record we conclude that the admission of the testimony, if error, was harmless beyond a reasonable doubt. *Wagner v. State*, 687 S.W.2d 303 (Tex.Cr.App.1984) (Opinion on Rehearing); *Watson v. State*, 605 S.W.2d 877 (Tex.Cr.App.1980) (Opinion on Rehearing).

In his next three points of error, appellant argues that the trial court erred in allowing three of the reputation witnesses to testify because they had not seen or heard of appellant in over fifteen years.

 As pointed out in the previous point of error, Stephen R. Stephens, a Dallas police officer, testified that he came into contact with appellant in 1965. Stephens testified that as a result of his contact with appellant at that time, he came to know appellant's reputation for being a peaceful and law abiding citizen. On cross-examination, it was elicited that Stephens had not seen appellant since March 24, 1965. No objection was made to Stephens's testimony on the ground now urged on appeal. *Euziere v. State*, 648 S.W.2d 700 (Tex.Cr.App.1983); *Crocker v. State*, 573 S.W.2d 190 (Tex.Cr.App. 1978). We find nothing is presented for review. Appellant's twelfth point of error is overruled.

Appellant did object to the testimony of Sgt. Jacob Mitchell of the Garland Police Department. Mitchell was allowed to testify that appellant's reputation for being a peaceable and law abiding citizen in Dallas County was bad. During cross-examination, it was established that Mitchell was basing his testimony on knowledge prior to 1963. The State also called Sgt. Carl Raley of the Dallas Police Department who testified that he was familiar with appellant's reputation for being a peaceful and law abiding citizen in December of 1960, when appellant was seventeen or eighteen years old. Over appellant's objection, Raley was also allowed to testify that appellant's reputation was bad.

Appellant argues that the inquiry as to character must be limited to the general reputation of the person in the community of his residence or where he is best known. Since none of the witnesses had been acquainted with appellant or his reputation in many years, and since appellant had not lived in the witness' communities for many years, appellant argues that the testimony should not have been admitted. He relies on *Long v. State*, 114 Tex.Cr.R. 339, 23 S.W.2d 390 (1930), a rape case. In *Long*, it was held error to allow a witness acquainted with Long in another county fourteen years prior to the return of the indictment, and not since, to testify as to Long's reputation.

 The instant case clearly does not fall within the holding in *Long*. Rather we find the case of *Anderson v. State*, 717 S.W.2d 622 (Tex.Cr.App.1986), another capital murder case, governs the disposition of this issue. In *Anderson*, the defendant argued that a reputation witness should not be allowed to testify without first establishing that his opinion was based on current observation. This Court noted that under Article 37.071, V.A.C.C.P., the trial court has wide discretion in admitting or excluding evidence at the punishment stage of the trial. The Court also noted that testimony about a defendant's reputation for being peaceful and law-abiding is probative of that defendant's propensity to commit criminal acts of violence. The Court then held that it is not necessary for the State to prove that its witness based his opinion of the appellant's reputation for being peaceful and law-abiding upon only current observations and conversations with other members of the community. We agree. Clearly a defendant's reputation for being a peaceful and law abiding citizen during his whole lifetime is probative of the issue of his propensity to commit criminal acts of violence. We find that the trial court did not abuse its discretion in admitting the evidence. Appellant's thir-

teenth and fourteenth points of error are overruled.

In his last point of error, appellant argues that reversible error occurred when the court allowed hearsay testimony to come before the jury. During the punishment phase of the trial, State's witness Bob Wade, assistant chief of police in Garland, testified that on January 4, 1963, while incarcerated in the brand new Garland city jail on a burglary charge, appellant escaped. On cross-examination defense counsel elicited from Wade that appellant was never charged with escape. On redirect the following occurred:

"Q. Chief, can you explain to the jury why no charges were filed on the escape?

"A. Why the charges were not filed?

"Q. Yes, sir.

"A. Yes, sir, on orders of the chief of police.

"MR. DROSNES: Objection. That would be hearsay.

"THE COURT: Objection overruled.

"Q. (By Mr. Guarino) Go ahead, Chief. Could you explain that to us?

"A. Orders of the Chief of Police, we did not file the charges. Frankly, it is an embarrassing situation to have a new jail, and a prisoner escape within 3 days.

"Q. It was an embarrassing situation?

"A. He felt it would be, and it was not filed."

■ The State asserts and we agree that none of the testimony above is hearsay. "Hearsay" is defined as an out-of-court statement offered in court for the truth of the matters asserted therein, thus resting for its value upon the credibility of the out-of-court asserter. *McKay v. State*, 707 S.W.2d 23 (Tex.Cr.App.1985). The statement, "[f]rankly it was an embarrassing situation to have a new jail and a prisoner escape within three days," was not an out-of-court statement. It was the opinion of the witness on the stand. The statement, "[h]e felt it would be, and it was not filed," was also not an out-of-court statement.

■ Even if such statements were hearsay, we find that the error in admitting them was harmless. The fact that appellant escaped from the Garland city jail was properly before the jury. In light of this fact and the other evidence presented to the jury during both phases of the trial, we cannot say that an average juror would have found the State's case any less persuasive if the evidence had been excluded by the trial court. See *Goodman v. State*, 701 S.W.2d 850 (Tex.Cr.App.1985); *Vanderbilt v. State*, 629 S.W.2d 709 (Tex.Cr.App.1981). Cf. *Ward v. State*, 657 S.W.2d 133 (Tex.Cr.App.1983). Appellant's fifteenth point of error is overruled.

The judgment is affirmed.

MILLER and DUNCAN, JJ., concur in the result.

CLINTON, J., dissents.

TEAGUE, Judge, concurring and dissenting.

There is much high and low mischief in the majority opinion by Judge McCormick. Time constraints prevent me from filing at this time a lengthier dissenting opinion.

I write because I find that the majority opinion by Judge McCormick correctly overrules appellant's first point of error in which he asserts that "The indictment is defective as a capital murder indictment in that it uses the act constituting the murder as the element that converted a theft into a robbery and then uses the robbery as the aggravating factor that converted the murder into a capital murder." This indictment does no such thing. The pertinent part of the indictment is set out on page 708.

As easily seen, in the very first pertinent sentence of the indictment, the State alleged that appellant murdered *TUAN NGUYEN* by shooting him with a rifle. The indictment next alleges that the murder occurred in the course of committing the offense of robbery, namely, the robbery of *NGUYEN NGUYEN*, another and different individual, in which it was alleged

that appellant did intentionally and knowingly cause bodily injury to *TUAN NGUYEN*. As easily seen, the State did not allege that the bodily injury to *TUAN NGUYEN* caused that person's death.

One of the ways that a person might commit the offense of robbery is if, in the course of committing theft, and with intent to obtain and maintain control of the property, he intentionally, knowingly, or recklessly causes bodily injury to another. See V.T.C.A., Penal Code, Section 29.02. The offense of murder is not an element of the offense of robbery.

One of the ways that the offense of capital murder might be committed is if an individual commits the offense of murder in the course of committing or attempting to commit the offense of robbery. See V.T.C.A., Penal Code, Section 19.03(a)(2). That is exactly what the State alleged in this cause; it alleged the primary offense of murder and then alleged that it was committed in the course of committing the underlying offense of robbery. The underlying offense of robbery, as alleged, however, did not have as an element thereof the offense of murder, and the State did not allege that it was an element of that offense.

Appellant's reliance upon the Common Law doctrine of merger or the felony murder statute of this State, see V.T.C.A., Penal Code, Section 19.02(a)(3), is sorely misplaced.

Had the indictment alleged that the primary murder was also an element of the underlying offense of robbery, then appellant would be correct that the State was erroneously "bootstrapping" itself to a capital murder, which would be impermissible simply because the State in that instance would have alleged that it had "spent" the murder "bullet" that it needed to prove the primary offense of murder. However, in this instance, the indictment does not allege that the murder was an element of the underlying offense of robbery. Thus, the State never alleged that it had "spent" the primary murder "bullet." Therefore, it still had available to it the murder "bullet." Therefore, I agree with the majority opinion that appellant's first point of error must be overruled.

However, because I cannot join most of what else is in the majority opinion, I am compelled to respectfully dissent to the rest of the majority opinion.