**David GRIJALVA, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 65174.**

Court of Criminal Appeals of Texas, En Banc.

Sept. 10, 1980.

Rehearing Denied April 29, 1981.

E. Dean Roper, Kenneth A. Back, Amarillo, for appellant.

Thomas Curtis, Dist. Atty., Steve Schiwetz, Carol Habern, Richard A. Keffler, Jr. and William R. Bowden, Jr., Asst. Dist. Attys., Amarillo, Robert Huttash, State's Atty., Austin, for the State.

OPINION

ODOM, Judge.

This is an appeal from a conviction for capital murder. After the punishment issues submitted under Art. 37.071, V.A.C. C.P., were answered affirmatively, the death penalty was assessed.

In his third ground of error appellant raises an issue that requires reversal under the recent Supreme Court decision in

*Adams v. Texas,* 581 U.S. ——, 100 S.Ct. 2521, 65 L.Ed.2d —— (1980). A prospective juror was excused on challenge by the State under V.T.C.A., Penal Code Sec. 12.31(b). We set out the controlling portions of the juror's voir dire examination:

(Questions by the Prosecutor)

"Q. In other words, being very honest with me, what you're telling me, you can't state under oath that the mandatory penalty of life or death won't affect your deliberations on any issue of fact?

"A. I cannot say that for such and for certain. It might affect it.

"Q. Being very honest with me?

"A. Being very honest.

"Q. Knowing what's coming if you are selected?

"A. It might affect it. I wouldn't want it to, but I'm human. It might affect it.

"Q. And it seems to me from listening to you that these—although you have said you possibly could give the death penalty in a proper case—

"A. Uh-huh.

"Q. —you've got some awfully serious reservations about it. I can tell the amount of thought that you have given it up to this point in time.

"A. And I have given it a lot of thought.

"Q. I'll bet you have and I'll bet you have studied on it pretty serious since Monday.

"A. I have.

"Q. Have you talked about it with anybody?

"A. No.

"Q. In other words, just trying to—

"A. It's something that I have to work out myself because no one else can tell me how I feel.

"Q. Certainly. Certainly.

"A. And discussing it wouldn't help.

"Q. It's just something you have to—

"A. I had to make up my own mind about.

"Q. And I think that knowing as the Judge told you the other day that you had to come in here and say yes or no—

"A. He did.

"Q. —you finally came to the conclusion that, 'Well, I—I'm going to say yes, but, boy, I just really don't know about it.'?

"A. I wanted you to know that. I wanted you to know that, yes, I think I can do it but I'm not positive that I can. It might affect my yes and my no answers in the second phase of the trial.

"Q. What you're telling me is you can't state under oath that the mandatory penalty of life or death won't affect your answers to these questions of fact because you think that although you might try, that it probably would?

"A. Probably would.

"Q. In other words, to be very specific—and I don't want to tie you down, but it's such a serious matter.

"A. I know it's a serious matter, very serious, and I have thought about it a lot.

"Q. You can't state under oath that the mandatory penalty of life or death will not affect your deliberations on any issue of fact, can you? You can't make that statement?

"A. No.

\*    \*    \*    \*    \*    \*

(Questions by the Court)

"Q. Now, then, sitting in a jury room, you are deliberating on how you're going to answer two questions. By you, I mean the whole jury, 12 people, and you as an individual, also—

"A. Okay.

"Q. —if you were selected.

"Now, look at Question Number One, which has to be answered yes or no, and you feel that under the evidence heard the State has proven to you beyond a reasonable doubt that the answer to that question ought to be yes.

"Okay?

"A. Okay.

"Q. Then you look at Question Number Two. You review the evidence, talk about it, and you arrive at the conclusion that by the evidence you've heard in that

case the State has presented to you beyond a reasonable doubt that the answer to that question should be yes.

"Okay?

"A. Okay.

"Q. You are at the point now of putting a yes answer to one and yes answer to number two.

"Now, at that point the oath we are talking about would require any juror at that point to put down two yes answers knowing full well that when he did the Judge was going to sentence the Defendant to death—

"A. Uh-huh.

"Q. —instead of—

"A. Life.

"Q. Saying, 'Okay, I agree both of them sure ought to be answered yes. Not any question about that. Not any reasonable doubt in my mind but that ought to be answers to both of them, but because of my feelings about the death penalty I'm going to have to insist on a no to one of those.'

"A. I'm a very honest person and I think that if I felt both answers should be yes, I would put yes, but I'm—how can anyone know for sure that they would not let that influence them?

"Q. Nobody probably can know for sure.

"A. Can 12 people be picked that can honestly say that it would not affect their answer?

"Q. Okay. Now, the oath that we have been talking about as is contained in the law says, quote, a prospective juror shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact, and that means that when it comes down to that point the juror will go by what the facts are and not what his feelings are.

"A. And I would very definitely try to go by the facts, but I cannot swear under oath that it wouldn't—my feelings might affect it. I wouldn't want to mislead you and say that I can honestly say for sure

and for certain they might not. I don't think they would, but they might.

"Q. Okay.

"A. Now, what are y'all going to do with me?

"Q. Are you relatively comfortable right now?

"A. Uh-huh.

"Q. Okay. That's important to me.

"What we're going to do right now, because it's five o'clock, is recess for the night, come back at nine o'clock tomorrow morning and finish this voir dire.

\*     \*     \*     \*     \*     \*

(Questions by the Court)

"Q. Mrs. Pannell, in connection with the questions that were asked of you yesterday, is it fair to say that you're feeling about—and opinions about the imposition of the death penalty—penalty of death as a possible punishment in a capital case in Texas are essentially that it would be a very serious matter with you, but if it were a proper case—that is to say, one in which the law allows for the death penalty under certain circumstances—and a case which in your opinion the facts justified the infliction of the death penalty, that you could serve on a jury that may be called on to inflict a death penalty? Is that a fair statement?

"A. Yes.

"Q. Okay. Wouldn't be easy for you, but you could in a proper case?

"A. Right.

"Q. Okay. Now, if you were selected as a juror, you would be required to take the oath that we were talking about yesterday. All of the jurors would.

"A. Yes, sir.

"Q. Okay. Now, that oath is verbatim from the law, this: The mandatory penalty of death or imprisonment for life will not affect the juror's deliberation on any issue of fact.

"Now, if you were selected as a juror and I started to give you that oath, could you in good conscience take it and follow it?

"A. I'm not sure that I could.

"Q. Well, how about a yes or a no?

"A. No.

"Q. Okay. You will be excused from serving in this jury."

Section 12.31(b), under which this juror was excluded, provides:

"Prospective jurors shall be informed that a sentence of life imprisonment or death is mandatory on conviction of a capital felony. A prospective juror shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact."

In *Adams v. Texas*, supra, the Court restricted the constitutionally permissible scope of Sec. 12.31(b). The Court there stated:

"The State could, consistently with *Witherspoon* [*v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)] use Sec. 12.31(b) to exclude prospective jurors whose views on capital punishment are such as to make them unable to follow the law or obey their oaths. But the use of Sec. 12.31(b) to exclude jurors on broader grounds based on their opinions concerning the death penalty is impermissible."

Applying the restricted scope of Sec. 12.-31(b) to the facts in *Adams*, the Court concluded:

"We repeat that the State may bar from jury service those whose beliefs about capital punishment would lead them to ignore the law or violate their oaths. But in the present case Texas has applied Sec. 12.31(b) to exclude jurors whose only fault was to take their responsibilities with special seriousness or to acknowledge honestly that they might or might not be affected. It does not appear in the record before us that these individuals were so irrevocably opposed to capital punishment as to frustrate the State's legitimate efforts to administer its constitutionally valid death penalty scheme. Accordingly, the Constitution disentitles the State to execute a sentence of death imposed by a jury from which such prospective jurors have been excluded."

The same error as occurred in *Adams v. Texas*, supra, is evident in the record of this case, as demonstrated in the excerpts set out above.

We next consider the proposition that no reversible error is shown because the State did not exercise all of its peremptory challenges. *Chambers v. State*, Tex.Cr.App., 568 S.W.2d 313, was a capital murder case in which it was held that a prospective juror was improperly excluded on challenge for cause by the State. After deciding that error was committed, the Court held:

"However, because there is no showing that appellant did not receive a fair and impartial jury, and because the State exercised only 13 of its 15 peremptory challenges, one of which could have been used to remove [the erroneously excluded prospective ˙juror], no reversible error is shown. *Culley v. State* [Tex.Cr.App.], 505 S.W.2d 567; *Weaver v. State* [Tex.Cr. App.], 476 S.W.2d 326. And cf. *Henricksen v. State* [Tex.Cr.App.], 500 S.W.2d 491."

In reaching our decision in *Chambers v. State*, supra, we neglected to consider the differences between the jury selection procedures for capital and non-capital cases. The authorities relied on in *Chambers* were non-capital cases, and were therefore tried under different procedural rules than those applied in *Chambers* and in this case.

Initially, Art. 35.17, V.A.C.C.P., provides for the manner of conducting voir dire examination of prospective jurors:

"1. When the court in its discretion so directs, except as provided in Section 2, the state and defendant shall conduct the voir dire examination of prospective jurors in the presence of the entire panel.

"2. In a capital felony case, the court shall propound to the entire panel of prospective jurors questions concerning the principles, as applicable to the case on trial, of reasonable doubt, burden of proof, return of indictment by grand jury, presumption of innocence, and opinion. Then, on demand of the State or

defendant, either is entitled to examine each juror on voir dire individually and apart from the entire panel, and may further question the juror on the principles propounded by the court."

The manner of exercising peremptory challenges is explicitly differentiated in Arts. 35.13 and 35.25, V.A.C.C.P. The procedure followed in *Chambers* and this case is stated in Art. 35.13, supra:

"A juror in a capital case in which the state has made it known it will seek the death penalty, held to be qualified, shall be passed for acceptance or challenge first to the state and then to the defendant. Challenges to jurors are either peremptory or for cause."

On the other hand, in non-capital cases, such as those upon which *Chambers* relied, the procedure is quite different, as provided in Art. 35.25, supra:

"In non-capital cases and in capital cases in which the State's attorney has announced that he will not qualify the jury for, or seek the death penalty, the party desiring to challenge any juror peremptorily shall strike the name of such juror from the list furnished him by the clerk."

■ From these statutory provisions it is clear that in capital cases each party must exercise any peremptory challenge at the time the particular prospective juror has been qualified. The parties may not wait until all prospective jurors have been examined before exercising peremptory challenges as is allowed in non-capital cases.

In the recent capital murder case of *Vigneault v. State*, Tex.Cr.App., 600 S.W.2d 318, the defendant on appeal challenged the exclusion for cause of several prospective jurors. In disposing of one of those grounds of error the Court pointed out that at the conclusion of the jury selection process the prosecutor was allowed to make a "retroactive" exercise of four unused peremptory strikes, and used one of them against the person whose exclusion was challenged on appeal. In holding this action effective, the court noted, "Appellant neither objected to this procedure at trial, nor does he complain of it on appeal. Thus, we do not pass on the propriety of a party's exercise of peremptory challenges at the conclusion of individual voir dire in a capital case."

In today's case the State made no attempt to exercise its peremptory challenges at the conclusion of the voir dire, as was done in *Vigneault v. State*, supra. The possibility of such a retroactive exercise of peremptory strikes in this case, as in *Chambers v. State*, supra, is first considered after not only the return of the verdict, but also the erroneous exclusion for cause is found on appeal. Also in this case, unlike in *Vigneault*, appellant protested application of the rule under discussion during oral argument even before its application was urged. We find the challenged procedure is a corruption of the peremptory strike practice that violates the terms of Art. 35.13, supra, and gives an unfair advantage to the State in the jury selection process.

First, to allow the State to exercise its peremptory challenges in a capital case after conclusion of the voir dire examination gives it the benefit of making its judgments with a perspective of the entire panel, a perspective that is not given the defendant.

Second, giving such a privilege to the State allows it to withhold its strikes until after the defendant has exercised his strikes, even though Art. 35.13, supra, explicitly states that the qualified venireman shall be passed first to the state and then to the defendant. The statute would give the benefit to the defendant in instances where both sides might desire to strike the same venireman. Allowing the State to wait until the end of the selection process would transfer that benefit to the State.

Third, to allow retrospective exercise of peremptory challenges *on appeal* gives the State even greater advantages. When used on appeal the State effectively postpones exercise of its strikes until error has been found, and then with the benefit of the ruling of this Court as its guide the State can maximize the accuracy of the strikes not used at trial. In actuality this Court

not only counsels the State, but actually exercises the strike for the State. In effect a peremptory strike against a prospective juror is transformed into a peremptory strike against a ground of error.

Upon consideration of the various unfair advantages given the State by the ruling in *Chambers v. State,* supra, which allowed the State in effect to exercise its peremptory strikes in the light of 20–20 hindsight, illuminated by a privileged view of all prospective jurors, of the defense exercise of peremptory strikes, and of the subsequent appellate decision, we overrule that decision and hold that the fact that the State had unused peremptory challenges does not cure the error in this case.

We also note that *In re Anderson,* 69 Cal.2d 613, 73 Cal.Rptr. 21, 447 P.2d 117 reached a similar conclusion on federal constitutional grounds. Referring to that decision in *People v. Velasquez,* 26 Cal.3d 425, 162 Cal.Rptr. 306, 606 P.2d 341 (1980) the California Supreme Court said:

"The Attorney General argues that a different rule should apply when the prosecution fails to exhaust its peremptory challenges, and thus could have utilized a peremptory challenge to excuse the juror in question. We rejected an identical argument in *In re Anderson,* supra, 69 Cal.2d 613, 619 [73 Cal.Rptr. 21, 447 P.2d 117]. '*Witherspoon,*' we said, 'did not discuss the effect of the existence of remaining peremptory challenges of the prosecution, but the broad language of the opinion establishes without doubt that in no case can a defendant be put to death where a venireman was excused for cause solely on the ground he was conscientiously opposed to the death penalty. According to our understanding of *Witherspoon,* reversal is automatically required if a venireman was improperly excused for cause on the basis of his opposition to the death penalty.' The Supreme Court's summary reversal in *Davis v. Georgia,* supra, 429 U.S. 122 [97

S.Ct. 399, 50 L.Ed.2d 339] of a lower court decision finding *Witherspoon* error nonprejudicial, suggests that we interpreted the high court's opinion correctly."

Without reaching the federal issue we overrule *Chambers v. State,* supra, on state law grounds.[1]

Even though the error affects only the death penalty, it is not such error as would preclude the State from seeking the death penalty on a retrial. We therefore are unable to reform the punishment to life and affirm.

The judgment is reversed and the cause remanded.

DOUGLAS, J., concurs in the result.

ROBERTS, Judge, dissenting.

I dissent to the reversal of the judgment of guilt, for the reasons stated in my opinion in *Evans v. State,* 614 S.W.2d 414 (Tex. Cr.App. 1980).

## CONCURRING OPINION TO OVERRULING STATE'S MOTION FOR REHEARING WITHOUT WRITTEN OPINION

TEAGUE, Judge.

I concur in the majority's action for the reasons set forth in my Concurring Opinion to Overruling State's Motion for Rehearing Without Written Opinion in *Pierson v. State,* 614 S.W.2d 102 (1981).

## DISSENTING OPINION TO DENIAL OF STATE'S MOTION FOR REHEARING WITHOUT WRITTEN OPINION

McCORMICK, Judge.

The majority denies rehearing in this cause, thereby reversing a conviction of capital murder. Relying on *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 64 L.Ed.2d 581 (1980), it was found that a juror was improperly excused under V.T.C.A. Penal Code, Section 12.31(b). Although in agree-

---

1. We note that *Esquivel v. State,* Tex.Cr.App., 595 S.W.2d 516, relied on the rule overruled here as an alternative basis for overruling a ground of error, yet the issue was correctly decided on the other theory relied on.

ment with that ruling, I find myself confounded by the Court anxiously overruling *Chambers v. State*, 568 S.W.2d 313 (Tex.Cr. App.1978).[1] Because of this departure from established precedence and a misconstruction of the relevant statutes, I dissent.

At first blush, the majority opinion appears persuasive. However, the majority has erroneously overruled sound precedence. Article 35.17(2), V.A.C.C.P., provides that, on demand, veniremen shall be examined individually and apart from the panel. There is nothing in this statute itself, however, which requires that challenges be made after examination of each venireman and prior to the examination of the next venireman. This statute merely provides a scheme whereby the jury panel is prohibited from hearing the questions and answers of each individual venireman.

Article 35.13, V.A.C.C.P., provides that, in capital cases, a venireman shall be *passed* for acceptance or challenge first to the State and then to the defendant. The statute itself *does not* require, however, that strikes be made immediately upon completion of the examination of each individual venireman. In other words, there is nothing in the statute which would prohibit separate voir dire of each member of the entire jury panel prior to the time the State is put to the election of making its challenges before the defendant.

Article 35.25, V.A.C.C.P., requires a defendant, in non-capital cases, to make his peremptory strikes without knowledge of whom the State will peremptorily strike. Under 35.13, supra, the capital defendant exercises his strikes after the State has made its "strike" decision. Under this interpretation, the fairness trilogy that the majority argues is rendered moot. Contrary to this Court's opinion, it is not a corruption of the peremptory strike practice and does not violate the terms of Article 35.13, supra. Neither does it give "unfair" advantage to the State in the jury selection process. It is a means by which *Wither-*

spoon v. United States*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), error may be held harmless and render unnecessary retrials or release of convicted murderers.

At least three other jurisdictions have reached the same result at *Chambers*. See *Alderman v. State*, 241 Ga. 496, 246 S.E.2d 642 (1978), cert. denied, 439 U.S. 991, 99 S.Ct. 593, 58 L.Ed.2d 666; *Ruffin v. State*, 243 Ga. 95, 252 S.E.2d 472 (1979), cert. denied, 444 U.S. 995, 100 S.Ct. 530, 62 L.Ed.2d 475; *Jones v. State*, 243 Ga. 820, 256 S.E.2d 907 (1979), cert. denied, 444 U.S. 957, 100 S.Ct. 437, 62 L.Ed.2d 329 (1980); *State v. George*, 346 So.2d 694 (La.1977); *Gall v. Commonwealth*, 607 S.W.2d 97 (Ky.1980).

The State's motion for rehearing should be granted, and, based on *Chambers*, the judgment should be affirmed.

---

1. *Chambers* would allow this conviction to stand because the State had not used all of its peremptory strikes.