Richard Lee BEAVERS, Appellant,

v.

The STATE of Texas, Appellee.

No. 70712.

Court of Criminal Appeals of Texas,
En Banc.

April 7, 1993.

Rehearing Denied May 12, 1993.

Richard Frankoff, Brian Wice, Houston,
for appellant.

John B. Holmes, Jr., Dist. Atty., and
Alan Curry and Danise Crawford, Asst.
Dist. Attys., Houston, Robert Huttash,
State's Atty., Austin, for the State.

## OPINION

McCORMICK, Presiding Judge.

In this automatic, direct appeal from appellant's capital murder conviction and death sentence, appellant's counsel raises three points of error. V.T.C.A., Penal Code, Section 19.03(a)(2); Article 37.071(b), V.A.C.C.P. Appellant also raises four pro se points of error. We will affirm.

Appellant does not challenge the sufficiency of the evidence to support his conviction or the jury's affirmative answers to the special issues. Briefly stated, the evidence from the guilt-innocence stage, viewed in the light most favorable to the verdict, supports findings beyond a reasonable doubt that at 9:00 p.m. on August 18, 1986, appellant pulled a firearm on a husband and wife in their apartment after they let him in to use the telephone.[1] Appellant said he needed money for drugs. After taking some money and other property from the apartment, appellant forced the husband and wife to drive him in their car to several automated teller bank machines where he emptied their bank accounts. He then forced them to drive to a restaurant, where the husband worked as an assistant manager, and persuaded the husband to get the money from the safe while appellant waited in the car with a gun pointed at the wife.

Throughout the entire ordeal appellant told the husband and wife he would not hurt them. He eventually took them out to a field and made them kneel down. He suddenly and fatally shot the husband while the wife watched. Appellant then took the wife to several different locations and sexually assaulted her at least once. He eventually shot the wife and left her in a field. She recovered from her physical injuries and testified against appellant at his trial.[2]

Appellant's first point of error asserts his death sentence violates the Eighth and Fourteenth Amendments to the United States Constitution as applied to him because the special issues at the punishment phase prevented the jury from considering and applying appellant's mitigating evidence. Appellant bases this claim on *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). The record reflects the trial court refused to submit the following charge that appellant requested:

"Under the Constitution of the State of Texas and the United States Constitution, you are instructed that you must consider all the evidence in the case, including any aggravating factors and evidence that mitigates against the imposition of the death penalty. That is, you must consider all evidence which has any bearing on the two special issues before you, but you must also consider any mitigating evidence or extenuating circumstances that might lead you to believe that the death penalty would not be appropriate.

"Therefore, if you find beyond a reasonable doubt that the answer to each special issue is "yes," but believe from all the evidence, including both aggravating and mitigating factors, that the death penalty is not appropriate in this case, you are instructed not to answer the special issues."

At the punishment phase, the State reoffered the evidence it introduced at the guilt-innocence stage, and presented, among other things, evidence of appellant's extensive criminal history dating back to when he was a juvenile. Appellant presented a 1975 presentence investigative report (PSI) that was prepared in Virginia in connection with an offense he committed there as a juvenile. This report indicated appellant had a long-term substance abuse problem. Appellant began using drugs and alcohol at about age 10. The PSI indicated appellant blamed most of his substance abuse problem on his alcoholic father, who began to give appellant alcohol when appel-

---

1. The husband and wife and appellant were casually acquainted; appellant either lived or recently had lived in the same apartment complex as the husband and wife.

2. The record reflects that appellant's counsel, pursuant to appellant's instructions, did not cross-examine the wife at trial.

lant was very young. The PSI further indicated appellant "was known" as an habitual liar. Based on appellant's drug problem and his tendencies toward violence, the PSI indicated appellant was a serious threat to his community without intensive treatment in a controlled environment.

Appellant also presented a January 12, 1976, letter from a Dr. Molchon who treated appellant at a psychiatric hospital in Virginia in the fall of 1975. Dr. Molchon's letter discussed appellant's long history of antisocial behavior "manifested by drug use, poor school adjustment, multiple behavioral problems plus repeated legal offenses." This letter indicated that while hospitalized, appellant's mental status rapidly improved, and when discharged, appellant "showed no further evidence of thought disorder or organic brain syndrome." Appellant was discharged from the hospital "with a diagnosis of psychosis with drug intoxication, resolved, and antisocial personality." Dr. Molchon's letter concluded that appellant's prognosis for improvement with treatment was poor, and, to be successful, any treatment would have to occur in a highly structured setting over a long time.

Appellant also presented the testimony of Donna Broussard "an intervention specialist in a field dedicated to substance abuse." She interviewed appellant several times while he was in jail on the present charges. She testified appellant's upbringing and his drug abuse explained most of his criminal behavior. Based on her conversations with appellant, she testified it became obvious to her that appellant's family was a typical chemically dependent, dysfunctional family.[3] Broussard further testified to a "great deal of abuse" in appellant's home:

"Q. Now, regarding still the family unit that we are describing, can you tell us whether or not in your interviews of either spousal abuse or child abuse?

"A. From the information I received there was a great deal of abuse both toward the wife and toward the children. Whether that was physical or emotional is unclear, but it was related as being both."

She also testified appellant's aggressiveness increased with his continuous use of drugs at increased levels. She testified the probability of appellant continuing to use drugs was 100%.

Broussard also testified drug abuse retards a person's ability to make "good decisions." She said appellant's emotional development had been impaired by his drug abuse; appellant was a "13 year-old child in a 33 year-old body." Broussard also testified that someone with appellant's history of drug abuse could suffer "blackouts" from ingesting too many drugs and alcohol meaning that person would not remember his behavior during the blackout. She testified appellant probably had suffered blackouts many times. She also testified to appellant's religious conversion in jail. On cross-examination, she testified appellant was not mentally retarded and he knew the difference between right and wrong.

Appellant also presented the testimony of Dr. Degner, a medical doctor specializing in the area of drug abuse. He testified appellant had a severe drug abuse problem. He also testified that someone who continuously used drugs from the age of 10 would have the maturity level of a 10 year-old even when that person reached 30 years of age.

Dr. Degner testified to his opinion, based on his interviews with appellant and other factors, that appellant had blackouts on many occasions including the day of the offense.

"Q. In your interviews and your studies of the PSI and with [appellant] did you form an opinion as to whether or not [appellant] had blackouts?

**3.** On cross-examination, Broussard testified she did not interview any of appellant's family members. The 1975 PSI report indicated appellant has four brothers. Three of the brothers had no history of legal or substance abuse problems. One of the brothers smoked marijuana, but had no arrest record.

"A. Yes, he has had blackouts, many.

"Q. Did you form an opinion as to whether or not he had had a blackout on August 18, 1986?

"A. Is that the date of the crime?

"Q. Offense.

"A. Yes. He told me of not really remembering anything from around noon and that's fuzzy. He is not real sure around 10:00 o'clock, but somewhere around noon he has essentially no recall until he found himself around 8:00 [p.m.]. Again, that's fuzzy. That's a rough time. He is not sure there either, at the door of this apartment trying to put his key in his old apartment door."

Dr. Degner also testified that someone who is having a blackout can appear to another person to be functioning normally. Dr. Degner testified it was unlikely appellant could have committed a deliberate act on the day of the offense because appellant had drifted into an eight-hour blackout after ingesting drugs that morning.

"A. I just believe with what [appellant] told me he had taken starting early in the morning and then the types of drugs he ingested still early in the morning, 7:00, 7:30, 8:00 o'clock, and then drifting into an eight-hour blackout, I think that's very, very likely that he was operating, you know, in an impaired state. Now, how impaired I really don't know, but I think the chances of having, you know, his wits about him, all of his judgment, all of his ability to consider consequences and things like that would be highly impaired.

"Q. Do you believe that a person who had ingested, hypothetically, all these drugs over this period of time could be able to do a deliberate act, a conscious, willful act, knowing the full consequences of the act?

"A. I think that's unlikely."

On cross-examination, Dr. Degner confirmed appellant told him that he had a blackout from 12:00 noon until 8:00 p.m. on the day of the offense, and he had some memory of events after that.

"Q. Doctor, I want to clear up something. You said [appellant] had a blackout from 12:00 noon until 8:00 that night or p.m.?

"A. Yes, that was what he told me.

"Q. On the day of the offense?

"A. Yes.

"Q. And did he have memory of the events after that?

"A. Yes, he had some."

Dr. Degner also testified appellant was articulate and understood the concepts they discussed. He testified appellant was not like a mentally retarded person who has the mental function of a 6-year-old.

On redirect, Dr. Degner testified appellant understood the difference between right and wrong when he was sober; however, he was not sure whether appellant understood that difference when he was intoxicated. Dr. Degner also testified appellant's prognosis for improvement with treatment was poor.

Father Brinkman, a priest, testified that someone with appellant's background would be impaired in making certain kinds of moral decisions. However, Father Brinkman was unable to express an opinion on appellant's ability to make moral choices at the time of the offense.

Walker, a jailer at the Harris County jail where appellant was incarcerated before trial, also testified. He said appellant was well-behaved.

■ A state cannot preclude a jury from considering "relevant mitigating evidence" offered by a defendant as the basis for a sentence less than death. See *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); see also *Graham v. Collins*, —— U.S. ——, —— – ——, 113 S.Ct. 892, 901–902, 122 L.Ed.2d 260 (1993) (reh'g denied March 1, 1993); *Penry*, 492 U.S. at 316–18, 109 S.Ct. at 2946. Here, appellant relies on evidence of his drug abuse and addiction that retarded his emotional development and ability to make "good decisions," and of his volun-

tary intoxication on the day of the offense that caused him to have a blackout. Appellant also relies on evidence of possible childhood abuse in the home, and the possibility he came from a dysfunctional family. He also relies on evidence of his religious conversion and good behavior in jail.

■ Here, however, there is no evidence appellant was having a blackout when he committed the offense.[4] We also have held evidence, like that here, "regarding [a defendant's] drug abuse and addiction [and] his intoxication at the time of the offense" requires no separate *Penry* instruction. See *Lane v. State*, 822 S.W.2d 35, 39 (Tex. Cr.App.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1968, 118 L.Ed.2d 568 (1992). In addition, the thrust of appellant's evidence was that he was incapable of committing a deliberate act at the time of the offense. The jury could have given full mitigating effect to that evidence in answering special issue one. See *Lackey v. State*, 819 S.W.2d 111, 134–36 (Tex.Cr.App.1989); *Graham,* —— U.S. ——, ——, 113 S.Ct. at 902–903.

■ The evidence of appellant's immaturity and inability to make "good decisions" due to his drug abuse, unlike the evidence of mental retardation in *Penry*, does not make appellant less morally culpable for his adult behavior "according to contemporary moral values as shared by a significant segment of our society." See *Draughon v. State*, 831 S.W.2d 331, 339 (Tex.Cr. App.1992) *cert. filed* (October 5, 1992); *Lackey,* 819 S.W.2d at 134–35; see also *Penry*, 492 U.S. at 318–20, 109 S.Ct. at 2947. Therefore, this evidence required no separate *Penry* instruction.

■ Broussard's testimony of possible childhood abuse and the possibility appellant came from a dysfunctional family, unlike the evidence of a history of harsh

childhood abuse in *Penry*, raised no issue of whether appellant suffered from a history of childhood abuse or whether his commission of the crime was attributable to childhood abuse. Therefore, this evidence required no separate *Penry* instruction. See *Lackey*, 819 S.W.2d at 134–35.

■ Finally, the jury could have given full mitigating effect in answering special issue two to appellant's evidence of "positive character traits" regarding his religious conversion and good behavior in jail. See *Goss v. State*, 826 S.W.2d 162, 167 (Tex.Cr.App.1992), *cert. filed* (September 14, 1992); *Boyd v. State*, 811 S.W.2d 105, 111–12 (Tex.Cr.App.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 448, 116 L.Ed.2d 466 (1991); see also *Graham,* —— U.S. ——, 113 S.Ct. at 902. Therefore, appellant's evidence of "positive character traits" required no separate *Penry* instruction. Appellant's first point of error is overruled.

■ Appellant's second point of error claims the trial court erred in submitting a charge to the jury pursuant to the version of Article 37.071(d), (e) and (g), V.A.C.C.P., applicable to appellant's case.[5] The trial court refused to submit the following charge appellant requested at the punishment phase:

> "You are instructed that you may not answer any issue 'yes' unless you unanimously agree beyond a reasonable doubt. You may not answer any issue 'no' unless ten or more you (sic) have a reasonable doubt thereof. The State has the burden of proof to show beyond a reasonable doubt that the answer is 'yes.' "

Pursuant to former Article 37.071, subsections (d), (e) and (g), the trial court instructed the jury as follows:

> "You are further instructed that if any juror, after considering the evidence and

---

4. The only testimony we find concerning whether appellant was having a blackout at the time of the offense is Dr. Degner's. However, Dr. Degner testified on both direct and cross-examination, based on appellant's own admissions to him, that appellant's blackout had ended by 8:00 p.m. on the day of the offense, and he had some memory of events after that. It is undisputed appellant first entered the apartment of the complainant and his wife at 9:00 p.m. There-

fore, we find no evidence that appellant was having a blackout at the time of the offense, so we find it unnecessary to decide whether such circumstances in a case like this would require a separate *Penry* instruction. See *Lackey v. State,* 819 S.W.2d 111, 136 (Tex.Cr.App.1989).

5. See Acts 1985, 69th Leg., ch. 44 § 2, eff. Sept. 1, 1985.

these instructions, has a reasonable doubt as to whether the answer to a Special Issue should be answered 'Yes,' then such juror should vote 'No' to that Special Issue in the jury's deliberations. "If ten (10) jurors or more vote 'No' to that Special Issue, and only if ten (10) jurors or more vote 'No,' then the answer of the jury shall be 'No' to that issue; and the Foreperson will so record the jury's answer by signing his or her name to the finding reflecting such answer on the form provided for that purpose.

"You are further instructed that if the jury returns an affirmative finding on each of the issues submitted, this Court shall sentence the defendant to death. If the jury returns a negative finding on any issue submitted, the Court shall sentence the defendant to confinement in the Texas department Corrections for Life."

Appellant argues he timely requested a jury charge which would have permitted the jurors to refuse to answer a special issue if they were unable to do so. He then argues the trial court's instruction was coercive in that it suggested to the jury that the issues must be answered either "yes" or "no." He concludes by arguing:

> "[A]gain in light of *Penry v. Lynaugh,* the jury was not permitted to exercise its 'reasoned moral response' to the circumstances of this appellant and the case."

Appellant, in effect, argues he was entitled to a charge instructing the jury it could abstain from answering the special issues. However, the jury was charged in accordance with the statute, and appellant makes no constitutional challenges to the statute.

In addition, we recently have rejected appellant's argument and similar arguments on constitutional grounds. See *Hathorne v. State,* 848 S.W.2d 101, 124–125 (Tex.Cr.App.1992) (reh'g denied January 27, 1993), *no cert. history; Draughon,* 831 S.W.2d at 338 (abstention is not a jury option). To the extent appellant argues the court's charge prevented the jury from considering relevant mitigating evidence, we

disagree, and appellant has not demonstrated how the charge prevented the jury from considering relevant mitigating evidence. Tex.R.App.Pro. 74(f). Appellant's second point of error is overruled.

■ Appellant's third point of error asserts the trial court erred in not allowing him to retrospectively exercise an unused peremptory strike on juror Prilop after she had been exposed to prejudicial pretrial publicity. The record reflects appellant had one unused peremptory strike at the close of voir dire. Prilop previously had been accepted by the State and the defense during voir dire. Before the panel was sworn and empaneled as a jury, appellant filed a motion for mistrial because the venire had been exposed to articles about the case appearing in two local newspapers. The trial court held a hearing at which each member of the venire was questioned individually. The trial court denied appellant's motion for a mistrial and appellant's request to use his unused peremptory strike on Prilop.

The State argues no error occurred because appellant's request to retrospectively use a peremptory strike is not authorized in a capital case. See *Grijalva v. State,* 614 S.W.2d 420, 424–25 (Tex.Cr.App.1980); Article 35.13, V.A.C.C.P. Appellant responds by arguing that Article 35.13 was unconstitutionally applied to him because it permitted a juror, who was unable to render a fair and impartial verdict, to sit on appellant's jury. Appellant further argues, "[W]hile [Prilop's] examination by the parties did not necessarily show grounds for removal for cause, appellant's counsel was understandably concerned about her ability to render a fair and impartial verdict."

In support of his claim that Prilop had become unable to render a fair and impartial verdict, appellant relies on the following portion of the record during his initial questioning of Prilop at the hearing on appellant's motion for mistrial.

"Q. You haven't heard anything other than that or read anything other than that one particular thing?

"A. Yeah, there was something in the paper this morning.

"Q. Based upon that information, just what you have just told me, would you feel comfortable if you were in [appellant's] shoes to have a juror of your caliber sitting with that knowledge in the back of your mind?

"A. Probably not."

Appellant claims Prilop admitted she would feel uncomfortable if she were in appellant's place. The foregoing portion of the record does not necessarily support this claim. Even if it did, getting Prilop to admit that she would feel uncomfortable if she were in appellant's place, does not establish she had become a biased juror.

Moreover, based on later questioning by the trial court, it was entitled to find the pretrial publicity had not affected Prilop's ability to be a fair and impartial juror. See, e.g., Article 35.16(a)(10), V.A.C.C.P.

"Q. Is there anything in your mind changed since you were sworn in as a juror in this case at the time that you were accepted by the State and the defense and sworn in, is there anything in your frame of mind changed?

"A. No.

"Q. Do you have any preconceived notions of guilt or innocence at this point?

"A. No.

"Q. Can you be fair and impartial?

"A. I think so, yes.

"Q. Well, wait a minute. You think so?

"A. Yes.

"Q. Does that mean you can?

"A. Yes.

"Q. Can you sit through this trial and listen to the evidence and judge this case based upon the evidence and the testimony and upon that testimony and evidence alone and nothing else? Can you do that?

"A. Yes.

"Q. Can you take an oath, and you have taken an oath, to follow the law that I give you, whatever that law may be?

"A. Yes.

"Q. You know we discussed the law?

"A. Yes.

"Q. As far as that burden of proof is you understand what that is?

"A. On the State.

"Q. Okay. And can you follow the law?

"A. Yes.

"Q. Is there any reason in your mind that you can think of why you cannot serve and be a fair and impartial juror and a true verdict render according to the law and the evidence in this case? Is there any reason why you can't do that?

"A. No."

This record shows appellant's constitutional right to a fair and impartial jury was adequately protected. The trial court did not err in refusing appellant's request to retrospectively use his unused peremptory strike on Prilop. Appellant's third point of error is overruled.

Appellant's pro se points of error one through three make various constitutional challenges to Article 37.071, V.A.C.C.P. His fourth pro se point of error, in effect, claims his trial counsel was ineffective for failing to preserve his *Penry* claim. Having addressed the merits of appellant's *Penry* claim, this point of error is moot. Appellant's pro se points of error one through three lack merit. See *Graham,* — U.S. at ——, 113 S.Ct. at 902; *Penry,* 492 U.S. at 315–17, 109 S.Ct. at 2945–46; *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). Appellant's pro se points of error one through four are overruled.

The judgment is affirmed.

OVERSTREET, J., concurs in the result.

MALONEY, J., concurs in point of error No. 1, and otherwise joins.

CLINTON, J., dissents.

BAIRD, J., concurring.

Appellant presented evidence that his emotional development had been impaired as a result of his continuous drug use. According to the testimony of Dr. Degner,

appellant had the maturity level of a ten year-old child. Intervention specialist Broussard described appellant as a "thirteen year-old child in a 33 year-old body." Appellant contends evidence of his retarded emotional development constitutes *"Penry* evidence,"[1] and that the jury could not give effect to that evidence within the capital sentencing scheme of Tex.Code Crim. Proc.Ann. art. 37.071. In support of this argument, appellant relies solely upon the United States Constitution and does not seek relief under the Texas Constitution. The majority concludes the evidence did not require a "separate *Penry* instruction." Majority opinion pg. 433. For the following reasons I join the majority opinion.

In *Graham v. Collins,* —— U.S. ——, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993), the Supreme Court construed *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), "as holding that the circumstance of youth is given constitutionally adequate consideration" within the punishment issues of art. 37.071. *Graham,* —— U.S. at ——, 113 S.Ct. at 902. Therefore, in light of *Graham,* the majority correctly concludes appellant's evidence of emotional youth did not require a separate instruction under the Eighth Amendment as interpreted in *Penry.*

Although, appellant is presently foreclosed from obtaining relief under the Eighth Amendment, it is not clear what direction the Supreme Court will take on the issue of youth as a mitigating circumstance in a capital context. Hopefully, that question will be resolved when the Supreme Court decides *Johnson v. State,* 773 S.W.2d 322 (Tex.Cr.App.1989), aff'd on reh'g (No. 69,-750 delivered May 27, 1992), *cert. granted,* —— U.S. ——, 113 S.Ct. 1148, 122 L.Ed.2d 499 (1993).[2] Therefore, absent a separate claim under the Texas Constitution, we are bound to follow the Supreme Court's determination that youth can be given adequate Eighth Amendment consideration within the punishment issues under

art. 37.071, until the Supreme Court alters its prior holdings.

With these comments, I join the majority opinion.

Did the Texas capital sentencing statute unconstitutionally preclude the jury from giving full mitigating effect to the petitioner's youthful age at the time of the offense?

---

1.  *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

2.  The question presented in *Johnson* is: